**EMPLOYERS CASUALTY CO. v. UNDERWOOD et al.**

No. 18698. Opinion Filed Jan. 7, 1930.

Rehearing Denied March 25, 1930.

Check & McRill, for plaintiff in error.

Ledbetter, Stuart, Bell & Ledbetter and J. N. Townsend, for defendant in error.

HALL, C. Defendant in error, hereinafter referred to as plaintiff, commenced this action against plaintiff in error, hereinafter referred to as defendant, to recover indemnity on a policy of insurance.

The policy is a combination employer's liability and indemnity contract. Paragraph 1 (d) of the policy was to "indemnify this employer against loss by reason of the liability imposed upon him by law on account of such injury to such employees (of the insured) as are legally employed. * * *"

During the period which the policy was in force, Fred Garrett, a boy under the age of 16 years, was killed while employed by plaintiff in its cotton compress in Elk City in this state. The parents of the boy sued the plaintiff, the compress company, for damages in the sum of $30,000, and while the cause was pending in the district court, the action was settled and compromised by the payment of $5,000 to the parents. The defendant was notified of the proposed settlement and in response to the notice advised plaintiff that "in event it developed that the deceased was legally employed," it would "reimburse plaintiff for the amount paid in settlement," not exceeding, however, the amount of the liability stipulated in the policy.

Plaintiff thereupon settled with and paid the parents of the deceased boy the sum of $5,000 in full for their claim. This action was then commenced to recover under the indemnity provisions of the policy. The defense is that the deceased was not legally employed by the plaintiff, in that he was

employed to work in the compress: (1) In operating and assisting in operating dangerous machinery; (2) and operating and assisting in operating steam machinery; (3) that he was working in a factory or factory workshop where a machine was being used operated by steam power and electric power; (4) that the operation was especially hazardous to life and limb; (5) that the place where he was employed was a factory or factory workshop within the meaning of the child labor laws, and that he was a minor under 16 years of age and employed therein without the consent of his parents and without the age of the boy or his schooling certificate, as required by law, and no record was kept on file or posted showing the name, age, certificate of the minors employed, hours of work, etc.; that the minor did not have the required schooling to permit him to work, and that he was employed to work more than eight hours a day, and all told, therefore, his employment was in violation of Comp. Stat. 1921, sections 7208, 7209, 7211, 7212, 7213, and 7214.

The issues were tried to a jury, resulting in a verdict and judgment for plaintiff, and defendant appeals.

It is conceded that the only question involved is whether or not the employment of the deceased, Fred Garrett, was legal. If the employment was legal, the plaintiff properly prevailed. If the employment was illegal, the judgment was contrary to law.

It is conceded that the boy at the date of his employment and injury was over the age of 15 years and under the age of 16 years. Whether his employment was legal depends upon two important factors; (1) The nature of the work he was employed to perform in regard to the character of the machinery involved; and (2) the nature of the place, in regard to hazards at and about where he was employed to work.

The purpose of the cotton compress was to compress cotton, which we assume is everywhere understood as converting a bale of cotton into more compact form. The word suggests its definition. The particular method used at this compress was to give the bale of cotton a preliminary pressing and preparation before subjecting it to a high pressure press. This primary press was known as the "dinky" press, and was operated substantially as follows: A bale of cotton was placed between the two plates, one of which under the force of steam power moved in the direction of the opposite plate. When the bale of cotton was inserted, power was applied and the bale of cot-

ton was compressed to sufficient dimensions to permit the removal of the iron ties which had been placed thereon at the gin. After the ties were removed, in order to hold the bale of cotton together, a person on each side of the bale used hooks made of light steel wire, and with these hooks fastened together the covering containing the cotton, so that after it was released from the press the bale of cotton would remain temporarily intact. This process was repeated every 30 seconds. The manipulation of this machine required three men, or boys, one of which was a negro named Willie Easley, and one of the other two, the deceased, Fred Garrett. The negro boy operated the lever or throttle which raised or lowered the movable plate of the press. One boy worked on one side of the press fastening the bagging together with the hooks and another boy worked on the other side. One of these persons was Fred Garrett, the deceased.

After the cotton was removed from the so-called "dinky" press, it was taken to another press—the master press—about 15 or 20 feet away, and there subjected to powerful force, and the bale compressed to one-third of its original size. The work was performed with great speed. One hundred and twenty bales an hour were turned out of each of these presses. When the cotton was placed in the master press, of course the hooks fell off, or, with lightening-like process, were removed. A number of them would fall in an opening between the floor or compress and the plate connected to the movable plate of the press, and fall to the ground and under the big press.

The deceased, Fred Garrett, after he had been working but a few hours, went under the floor of the compress and under the giant plate, apparently for the purpose of recovering these wire hooks, and he was there crushed to death when the press receded. It was no part of his duty to go under the floor for these hooks, and there is no direct evidence that the boy went under the press to get them, but he went there for some purpose, and the particular purpose for which he went is not material or controlling in this case. He went there and was killed

As already stated, the defendant (plaintiff in error) relies upon several distinct grounds, as establishing its contention that the employment of the boy in this case was illegal. We deem it unnecessary, however, to consider but two of the grounds set forth: First, that the boy was operating or assisting in the "operation of steam machinery." Second, that he was employed or permitted to

work, in an "occupation especially hazardous to life and limb."

The controlling statutes are sections 7208, 7209, and 7214 of Comp. Okla. Stat. 1921 (sections 3728, 3729, 3734, Rev. Laws 1910).

On account of certain patent errors appearing in section 7214, Comp. Okla. Stat. 1921, we shall quote from the 1910 Revision. The applicable part of sections 3728, 3729 and 3734, Rev. Laws 1910, are as follows:

"3728. * * * No child under the age of 14 years shall be employed or permitted to work in any factory, factory work-shop, theater, bowling alley, pool hall, or steam laundry, and no child under the age of 15 years shall be employed or permitted to work in any occupation injurious to health or morals or especially hazardous to life or limb. * * *"

"3729. * * * No child under the age of 16 years sha'l be employed or permitted to work at any of the following occupations: Oiling or assisting in oiling, operating, wiping or cleaning any dangerous machinery, or adjusting any belt to any such machinery, while in motion; operating, or assisting in operating, circular or band saws, steam boilers, steam machinery, or other steam generating apparatus. * * *"

"3734. * * * Before any child under the age of 16 years shall be employed in any occupation specified in section 3728, it shall be the duty of the parent or guardian of such child to procure and furnish the employer of such child an age and schooling certificate as hereinafter provided in this article. * * *"

The other parts of the section provide in detail for the production of the age and schooling certificate, and require the employer to post in a conspicuous place the age of such children employed, and, in every room in which they are employed, the list of their names, ages, and the time of opening and closing the establishment; the number of hours of labor required; the number of shifts; the hours of commencing and s opping work, and time allowed for meals, etc.

It is admitted in this case that none of these provisions of the law were complied with. In addition to the question of the deceased being employed to assist in the operation of steam machinery or apparatus, the omission to comply with the provisions of said section 3734 injects in the case the question of whether or not the occupation at which the deceased was permitted to work was especially hazardous to life or limb, as provided in section 3728, Rev. Laws 1910. Stearns Lumber Co. v. Travelers Ins. Co., 150 Wis. 627, 150 N. W. 991; Morris v. Stanfield, 81 Ill. App. 264.

We shall first address ourselves to the

question of whether or not Fred Garrett was "assisting in the operation of steam machinery." To get a clearer conception of the nature and character of the work in which the deceased was engaged at the time of his death, it is well to advert to a portion of the testimony in the present case, which, in narrative form, is as follows:

"That Fred Garrett did not have anything to do with the machinery, except to hook up the bagging in the machine after the bale was compressed; that the lever which raised and lowered the press was operated by a negro by the name of Willie Easley; that he did not see Fred Garrett when he was hurt, but that his job was to use the hooks and hook the bagging so that after the ties were taken off the bale, it could be taken to the larger press and compressed; that the large press was 15 or 20 feet from the dinky press. * * * This hook was introduced in evidence; that the operation of hooking the bale took about 30 seconds; that the press received and discharged about 120 bales per hour, and that the boy had kept up with the press; that the press was opened, a bale inserted, steam pressure applied, the bale compressed, the bands removed from the bale, hooks applied and steam pressure released and bale removed, **an operation requiring three men, the boy being one of them,** and taking 30 seconds to perform; * * * that it was his opinion that the work that Fred Garrett was assigned to do was not especially hazardous to life or limb, but **that there was danger in working there on account of the presses and that the big press was especially dangerous."**

It is the contention of defendant in error that because Fred Garrett was not employed to manipulate the lever, throttle or valves of the steam machinery, he was not assisting in its operation. We think such a construction would be subversive of the purpose of the statutes, and would strike down the child labor law in practically all cases where the Legislature undoubtedly intended it to apply. The negro boy, Willie Easley, who operated the levers which controlled the machine, perhaps had the safest position of the three persons operating or manipulating this particular machine called the "dinky" press. All he had to do was to stand some distance away and open and close the throttle. The other persons, including the deceased, undertook the greater hazards surrounding that particular machine. The law was intended to throw the arm of protection around children working at or on a steam machine, as well as the person simply operating the control levers thereto. It would be but an empty play upon words to say that, in operating or putting to practical use a piece of steam machinery

like a paper mill, steel mill, printing press, or cotton compress, by a sufficient number of persons necessary to perform the work and purpose for which the machine was intended, **nobody was assisting in the operation of the machine** except the engineer who handled the throttle, valves, or clutch connecting or disconnecting its power. Such a perversion of the established meaning of the word "operate," in connection with machinery so extensive in use in modern life, would be ridiculous.

However, there is some respectable authority to the effect that because the deceased was not operating the valves or lever controlling the machine—in this case the "dinky" press— it should not be said that the deceased was engaged in operating or assisting in operating the machine. That seems to have been the doctrine adhered to by the New York Court of Appeals in Gallencamp v. Garvin Machine Co., 179 N. Y. 588, 99 N. E. 718, reversing 86 N. Y. S. 378.

As a general proposition, this writer has a very high regard or esteem for the courts of New York and their decisions; but their decisions are not persuasive when we are convinced that they are unsound. The foregoing decision by the New York Court of Appeals is out of harmony with the scheme of the law for the protection of children against the perils of workshops and factories.

It will be observed that our statutes use the expression "operating or assisting in operating * * * steam machinery." It is clear that the term "operating," in the statutes, means to put the machine to actual use in the business for which it was construc'ed and intended, and therefore all persons who performed work **directly** necessary to accomplish the purpose of the so-called "dinkey" press, that is, those who performed the work of preparing the bales of cotton at the "dinkey" press for the final or high pressure press, were operating or assisting in the operation of the primary or "dinkey" press, which was admitted to be a steam machine.

The word "directly," as used herein, is used in the sense in which it is generally used and understood, which is "proximately, or without intervening agency or person."

The present case is controlled by the decision of this court in the case of Curtis & Gartside v. Pigg, 39 Okla. 31, 134 Pac. 1126, and the case of Frank Unnewehr Co v. Standard Life & Accident Ins. Co. (C. C. A. 6th Cir.) 176 Fed. 16, 99 C. C. A. 490.

In the last-named case, the same conten-

tion regarding the persons operating or assisting in operating the machinery was urged with considerable seriousness. That case arose in the state of Ohio, and the facts are substantially as follows: A boy, under the age of 16 years, was employed as an off-bearer at a sawmill, manufacturing veneer lumber. The boy's duty was to stand five feet from the saw and catch the veneer after it had passed the saw. He had nothing to do with starting or stopping of the saw or the controlling of it. After the power was released from the saw by means of a kind of a clutch, it would still possess considerable momentum, and the method adopted for stopping it after releasing the power was to "jam" a piece of scantling between the edge of the floor and the disk of the saw. The boy Watson, who was injured, was warned by the men in charge not to try to stop the saw, and to "stop monkeying with the machine." But the boy, in spite of these admonitions, attempted to stop the saw in this way, and one of his arms was caught in the teeth of the saw and cut off. Discussing this particular point under consideration, the United States Circuit Court of Appeals said:

"The conclusion of the court below upon the facts was: Two persons were necessary to operate the saw. One was the man Stevens, who managed the carriage and brought the log into contact with the saw, and the other was the boy, who steadied the boards after they passed a given point, as they were sawed from the log, and finally bore them away to a pile. His services were as necessary as those of Stevens'. The claim made in behalf of plaintiff is that the language of the statute forbidding placing a child under the age of 16 years 'at employment whereby' its life or limb is endangered' limited the inhibition to service that could not be performed without danger to life or limb; and hence that no employment would be regarded as dangerous to life or limb of the child unless it involved operating or assisting in operating a dangerous machine. But does this take into account either the import of the words of the statute, or the purpose of such legislation?

"We do not find it necessary to consider whether the duty imposed upon Watson as off-bearer literally involved operating or assisting to operate the veneer saw. It is hard to conceive that an adult, much less a chi'd, could reasonably be expected at all times to keep all parts of his body within the bounds set for this off-bearer."

The next question presented is so interlocked and interwoven with the first question considered, to wit, the question of assisting in the operation of steam machinery,

that much of the argument or citation of authorities which we shall submit under this section of the opinion is applicable to the first proposition, as well as the proposition raising the question whether or not the deceased was employed at an "occupation especially hazardous to life or limb" as comtemplated by the statutes. In the case of Curtis & Gartside Co. v. Pigg, supra, this court announced the rule in the 8th paragraph of the syllabus as follows:

"Where a manufacturer assigns a boy under 16 years of age to work of assisting in the operation of a machine, the principal factors of which are circular saws, such act constitutes a violation of the prohibitions of the child labor laws, and if the boy is injured at such work, the manufacturer is liable."

In the case of Curtis & Gartside Co. v. Pigg, the plaintiff, the injured person, was a boy, employed and assigned to the duty of standing behind a saw or machine in a plant for manufacturing doors, blinds, etc. As the "stuff" or lumber passed through the saw, he would take it from an endless chain and place it on a truck to get it out of the way. The injury did not result from removing these light timbers which had been fed to the machinery, but was received by the boy attempting to oil the machinery while it was in motion. Oiling the machinery was no part of his duty. On rehearing of this case, Commissioner Brewer, in discussing the facts and the law applicable thereto, with much clearness and reason made the following analysis of the facts, together with the legal deductions:

"What does this testimony disclose? Simply this: That this boy was hired and assigned to assist in the operation of a machine, the principal factors of which were circular saws, in clear violation of the spirit, and we believe the letter, of the prohibition of the statutes relating to child labor. It is no answer to say that his injury was not caused by handling the timbers in front of the saws, but by reaching over and attempting to oil the saws. If he had not been there working at this machine, it certainly is not probable that he would have tried to oil the saws. The law tries to guard the child from the dangers arising out of the inexperience and the immaturity of the child mind. This law is based on the knowledge of men that children of 14 are immature in judgment, incautious, curious, and inquisitive as to the mechanism and operation of things, and that if placed to work with or at dangerous and complicated machinery, out of these very traits of childhood, they are likely to do just what this boy did, undertake to do something he thought to be in the line of his duty, and get hurt. The wisdom of

this law must be clear to all men who have, or are interested in, children. It needs no defense by us. The court has no duty in regard to it, except to insist and, where need be, to decide that it must be observed by all who employ labor, both in its letter and spirit.

"When defendant made this proof, it stood before the court condemned out of the mouths of its own witnesses; its position was one of admitted default in regard to its duty to this child. Had it not violated its duty in putting him to work at, around, and over —assisting in the operation of this dangerous piece of machinery—within the realm of all reasonable probability, he would not have been hurt and bodily maimed. We are not inclined to indulge in any nice refinements as to proximate cause, and do not need to rest this decision on whether or not plaintiff was told to oil the saws, a point upon which it is claimed the conflict in the evidence took the question of liability to the jury."

It is the contention of defendant in error, and the trial court so held, that the legality or illegality of the employment of the boy in the present case did not depend upon the nature of the occupation or character of the immediate surroundings of the place where the boy was assigned to work, whether such occupation or surroundings were dangerous or not, but depended wholly upon the character of the work which was **assigned to the boy to perform.** The court refused to submit to the jury the question of whether the boy was engaged in an "occupation specially hazardous to life or limb," but submitted only the question whether or not the boy **was assigned** to a work especially hazardous in its nature. The only instructions on this point which the court submitted were as follows:

"3. You are instructed that if you believe and find from the evidence that at the time the said Fred Garrett was killed that he was employed by the plaintiffs to work in said compress and was **assigned** to do work by plaintiffs that was especially hazardous to life or limb, you are then instructed that said employment was unlawful and your verdict should be for the defendant."

Instruction No. 4 contains the following clause:

"* * * If you find from a preponderance of the evidence that the work which the said Fred Garrett **was assigned to do,** to wit, hook up after what is known as the dinkey press, was not especially hazardous to life or limb, then your verdict should be for the plaintiffs * * *" (naming the sum).

It will be thus seen that the instructions of the court limited the jury to the consideration of the work to which the deceased, Fred Garrett, was **assigned,** and not the general nature of the work in which he was engaged, which included the immediate surrounding dangers in the mill or industrial plant.

The Kentucky Court of Appeals in the case of Casperson v. Michaels, 142 Ky. 314, 134 S. W. 200, had under consideration a state of facts bearing a close analogy to the present case. The court having under consideration a statute prohibiting the employment of minors under the age of 16, in certain occupations, held, in the second and third paragraphs of the syllabus as follows:

"The purpose of the statute was to protect children not only from the dangers necessarily incident to their employment, but from injuries that might result from their own carelessness and childish acts. In other words, the purpose of the statute was to prevent their being exposed to danger.

"Plaintiff in violation of the statute was employed to work at a mangle in a laundry. She was standing by the mangle waiting for the signal to commence work. She placed her hand near the driver at the rear of the mangle, and her hand was caught and injured. Held, that it is immaterial that she was not actually engaged at work at the time, or that she placed her hand on a part of the mangle where she was not required to work. As the statute was designed to prevent such an accident, her employment in violation of the statute was the proximate cause of the injury."

The United States Circuit Court of Appeals, 6th Cir., in the case of Frank Unnewehr Co. v. Standard Life & Accident Ins. Co., supra, had under consideration a case involving facts similar to the present case and governed by the same legal principles, and held, in the second paragraph of the syllabus, as follows:

"1. Whether the employment of a child 16 years of age as off-bearer from a veneer saw in a mill was an employment whereby his life or limb was endangered within Rev. St. Ohio, sec. 6986-1, prohibiting such employment, did not depend on whether the services required of the child could not be performed without danger to life or limb, but on whether the employment, considering the inevitable wear and tear of the strain of the position and the indifference to danger that would naturally follow from childish curiosity and inexperience, rendered the position dangerous."

"2. Plaintiff employed a child under 16 years of age as off-bearer from a circular veneer saw in a mill. The saw was 68 inches in diameter, weighing about 1,000 lbs., and extended about 45 inches above the

floor. When once started, the method adopted for stopping it after releasing the power was to jam a piece of scantling between the edge of the floor and the saw disk. It was no part of the child's duty to start or stop the saw, his duty being to stand some distance away from it and carry off the boards of veneer as they were sawed off. On several occasions, however, he voluntarily attempted to stop the saw, and was directed by adult co-employees not, to do so, that he would get hurt, and on the occasion of his injury, he attempted to stop the saw in this way, and one of his arms was caught in the teeth and injured. Held, that the child was employed in a position whereby his life or limb was endangered in violation of Rev. St. Ohio, sec. 6986-1, and hence a master, after being cast in an action for damages sustained by the child, could not recover over against an indemnity insurance company on a policy exempting the company from liability for injuries suffered by any person employed in violation of law as to age."

The opinion in this case by Warrenton, Circuit Judge, is an exhaustive and able treatment of the subject. The case arose in the state of Ohio, and the opinion contains copious citations from the decisions of the Ohio courts, and many from the courts of other states.

It should be mentioned here that these child labor laws are similar—that is, certain provisions thereof are similar—in practically all of the states. The court in the opinion in the Unnewehr Case, in quoting from the Supreme Court of Ohio, in Rolling Mill Co. v. Corrigan, 46 Ohio St. 283, 20 N. E. 466, 15 Am. St. Rep. 596, said:

"Persons who employ children to work with, or about dangerous machinery, or in dangerous places, should anticipate that they will exercise only such judgment, discretion, and care as is usual among children of the same age, under similar circumstances, and are bound to use due care, having regard to their age, and inexperience, to protect them from dangers incident to the situation in which they are placed. * * *"

The opinion also quotes with approval from the case of Braasch v. Michigan Stove Co., 153 Mich. 652, 118 N. Y. 366, 20 L. R. A. (N. S.) 500, which was an appeal from a recovery allowed in favor of a boy under the age of 16 years who had been injured in running a freight elevator in a factory. Testimony was offered to show that at the time of his employment the boy was 14 years and eight months old. The court took judicial notice that "an elevator, like many other machines, is a reasonably safe machine under proper management, but that an elevator is a place of danger to life and

limb in the hands of a boy of 14 years of age." At another juncture in the opinion, in Unnewehr Co. v. Standard Life & Accident Ins. Co., it was said:

"In Sterling v. Union Carbide Co., 142 Mich. 284, 105 N. W. 755, in considering the question of alleged contributory negligence respecting the conduct of a boy between 15 and 16 years of age while feeding metal into a corrugating machine, where his hand would not in the ordinary course of the work be nearer the roller than the width of the metal, the court said:

"'The statute takes cognizance of the immaturity of judgment of children under 16. * * * To construe this statute as designed to protect children from such dangers only as could not be obviated by persons of mature judgment would render it nugatory'."

The court in the Unnewehr Case, discussing the particular facts surrounding the injury involved therein, said:

"It does not appear from the photographs or from anything we have found in the record that the operator is required to make nearer approach to the saw while in operation than the off-bearer is; and it would seem that the duties of the person operating the veneer saw are probably lessened by the fact that the head sawyer has supervision of the veneer saw as well as of the saw that he operates personally. Is it to be said that the inhibition of the statute would be applied to the one position and withheld from the other? The accepted meaning of 'endanger' embraces exposure to injury coming from without as well as from within a given place or object. It is conceivable that there are many instances where attendants may incur danger quite equal to that of the operators themselves; but it is hard to conceive of a legislative purpose to furnish protection against only one of such dangers."

It must be clearly seen that these decisions are entirely consistent and harmonious with the holding of our own court in the case of Curtis & Gartside Co. v. Pigg. These decisions, as well as reason, explode plaintiff's theory that a person may be employed in a hazardous and dangerous place or occupation, provided he is assigned some duty which in itself is not dangerous. To measure legality or illegality of employment by the particular character of the work assigned to the employee would render the statute not only impotent, but wholly absurd. For example, operating a typewriter is not a hazardous task, but the statutes would not permit the assignment of a child to the position of operating such machine within a few inches or a few feet of an exposed conduit charged with a high tension elec-

tric current. The dispatching of wireless telegraphy is by no means hazardous, but it would become hazardous if pursued in a present day airplane. Many duties and much work within itself is neither hazardous nor injurious, but becomes hazardous because of the unsafe surroundings.

The experience of mankind is that children are incapable of seeing and appreciating many patent dangers. Certainly they are incapable of avoiding many of the hazards and perils which adults find no difficulty whatever in unconsciously or automatically avoiding. For this reason, the court looks to the spirit of the laws regulating child labor, and not to their strict literalism. Speaking generally on this point, the Supreme Court of Michigan, in the case of Braasch v. Michigan Stove Co., supra, said:

"Any construction of the statute which does not take into account the inexperience and natural heedlessness of children overlooks an important consideration. Undoubtedly, it was passed to protect children against accidents, which in adults might well be said to result from negligence on the part of the victim, but which in children would be largely due to a want of experience, or heedlessness, for which experience is ordinarily the only cure."

We clearly understand that the testimony indicated that the particular work to which the deceased was assigned, narrowed and circumscribed from other adjacent and proximate dangers, was not necessarily hazardous. All the witnesses, however, testified that the large press was an exceedingly dangerous machine; and its death dealing performance in this case clearly demonstrated that fact. We cannot, therefore, so construe the statutes as to restrict their application to the nature of the particular **work or task to which the child was assigned,** instead of the occupation in which he was engaged—the particular work with all its concomitant and directly associated perils—which means those dangerous agencies in proximity of and surrounding the work assigned to the child. In simple language, we may say, the dangerous surroundings.

The facts being undisputed, the question as to whether or not the deceased, Fred Garrett, was operating or assisting in operating steam machinery in this particular case was a question for the court. **The court** decided it erroneously. Also, the same rule applies regarding the question whether the deceased was employed at an occupation especially hazardous to life or limb, which, if true, renders the employment illegal for another reason. As already stated, the defendant requested the court to submit that question to the jury; but the court refused to do so, but did submit the question of the dangerous character of the work to which the child was **assigned.**

There was no particular contention that the particular work assigned was especially hazardous when considered separate and apart from the occupation; but, in view of the physical facts and the undisputed testimony, the question of the nature of the occupation was solely for the court. This view is entirely consistent with the rule that: "Where men of reasonable minds might draw different conclusions from the evidence, the case is for the jury"; and this is so, although the evidence is uncontradicted; that is, where facts proved without dispute require the exercise of reason and judgment, so that one reasonable mind may infer that a controlling fact exists and another that it does not exist, there is a question of fact. On the other hand, if there is no room for difference of opinion by the men of reasonable minds, there is no question of fact for the jury. 38 Cyc. 1539.

In this case, had the question of the dangerous nature of the occupation been submitted to the jury, and had the jury found that the occupation in which the boy was engaged was not dangerous, there would have been no basis upon which the verdict could have stood.

For the reasons herein stated, the judgment of the trial court is hereby reversed, with directions to sustain defendant's demurrer to the plaintiff's testimony, and render judgment for the defendant.

TEEHEE, LEACH, and REED, Commissioners, concur. BENNETT and JEFFREY, Commissioners, concur in conclusion. HERR, Commissioner, dissents. DIFFENDAFFER, Commissioner, dissents on all points decided.

By the Court: It is so ordered.